# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| Bobby Ray Smith and Cheryl Kinsey Smith, | ) ) ) | Civil Action File No.: |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Equifax Information Services, LLC and Pacific Union Financial, LLC, | ) ) ) | **COMPLAINT WITH JURY TRIAL DEMAND** |
| Defendants. | ) ) | |

## PRELIMINARY STATEMENT

Under the Fair Credit Reporting Act, 15 U.S. Code § 1681, *et seq*. (the "FCRA"), consumer reporting agencies are charged with two primary duties: the duty to follow reasonable procedures to assure maximum possible accuracy of information when preparing consumer reports; and the duty to reasonably reinvestigate consumers' disputes of inaccurate information, and then appropriately correct or modify the disputed information. A consumer reporting agency's duty to reasonably reinvestigate consumers' disputes of inaccurate information explicitly includes the duty to notify the furnisher of the disputed information. This is because

1

the furnisher of the disputed information stands in a far better position to make a thorough investigation of the disputed information than the credit reporting agency.

Under the FCRA, furnishers of information have two similar primary duties: to report complete and accurate information regarding the consumers about whom the furnishers report; and, upon receiving notice of a consumer's dispute from a consumer reporting agency, to conduct an investigation of the disputed information, and then modify, delete, or permanently block the reporting of that information as appropriate.

Defendants report, compile, and maintain information concerning Plaintiffs' credit-worthiness, credit-standings, credit capacities, characters, and general reputations. That information is then made available by third-parties in credit transactions involving Plaintiffs, for employment purposes, the underwriting of insurance for Plaintiffs, and even in connection with a determination of Plaintiffs' eligibility for a license or other governmental benefit. Accordingly, and pursuant to various provisions of the FCRA, Plaintiffs have a legally protected interest in Defendants fulfilling their respective duties under the FCRA, so that the information reported and maintained by Defendants is done so in a manner which is fair and

equitable to Plaintiffs, with regards to the confidentiality, accuracy, and relevancy of that information.

This action for damages is based on Defendants' false reporting on Plaintiffs' credit files and/or consumer reports, failures to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiffs, and failures to conduct reasonable investigations and reinvestigations with respect to disputes of such information.

## **PARTIES**

1.     Plaintiff, Bobby Ray Smith (hereinafter "Mr. Smith"), is a natural person who resides in Douglas County, Georgia.

2.     Mr. Smith is an individual and is, therefore, a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

3.     Plaintiff, Cheryl Kinsey Smith (hereinafter "Mrs. Smith"), is a natural person who resides in Douglas County, Georgia.

4.     Mrs. Smith is an individual and is, therefore, a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

5.     Defendant, Equifax Information Services, LLC (hereinafter "Equifax"), is a limited liability corporation formed under the laws of the State of Georgia. Equifax may be served with process via its registered agent, Lisa Stockard, at 1550 Peachtree Street NE, Suite H46, Atlanta, Georgia 30309-2402.

6.     Equifax regularly assembles and/or evaluates consumer credit information for the purpose of furnishing consumer reports to third parties and uses interstate commerce to prepare and/or furnish the reports. Accordingly, Equifax is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

7.     Defendant, Pacific Union Financial, LLC (hereinafter "Pacific Union"), is a limited liability corporation formed under the laws of the State of California, with its principal place of business in Texas, and is registered to do business in the State of Georgia. Pacific Union may be served with process via its registered agent, C T Corporation System, at 289 South Culver Street, Lawrenceville, Georgia 30046-4805.

8.     Pacific Union regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer

4

transactions, such as Plaintiffs' transactions at issue in this lawsuit and described herein, and is, therefore, a "furnisher" as that term is used in 15 U.S.C. § 1681s-2.

## JURISDICTION AND VENUE

9.     This Court has federal question jurisdiction over Plaintiffs' Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*., claims, pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

10.    This Court has personal jurisdiction over Defendants, pursuant to O.C.G.A. § 9-10-91(1), because, *inter alia*, Defendants frequently and routinely conduct business in the State of Georgia, including the conduct complained of herein.

11.    Pursuant to 28 U.S.C. § 1391, venue is proper in the Northern District of Georgia because a substantial part of the events or omissions giving rise to the claims occurred in this district. Pursuant to LR 3.1B(3), NDGa, venue is proper in the Atlanta Division because one or more Defendants maintain agents for service of process within the Atlanta Division.

**Factual Allegations Regarding Plaintiffs' Mortgage**

12.    On or about September 11, 2015, Plaintiffs obtained a loan from Homestar Financial Corporation (hereinafter "Homestar") for the original principal amount of $220,924.00 (the "Mortgage").

13.    The Mortgage is collateralized by residential real property located at 3011 Olde Tabby Drive, Douglasville, Georgia 30135-9222, as evidenced by the Security Deed recorded at Deed Book 3329, Page 784, in the Superior Court of Douglas County.

14.    On or about October 24, 2017, the Mortgage was transferred from Homestar to Pacific Union, as evidenced by the Assignment recorded at Deed Book 3546, Page 358, in the Superior Court of Douglas County.

**Factual Allegations Regarding Plaintiffs' Bankruptcy Case**

15.    On October 12, 2017, Plaintiffs filed a Chapter 13 Voluntary Bankruptcy Petition in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, Case Number 17-67880 (the "Bankruptcy Case").

16.    In Schedule D of their Bankruptcy Petition, Plaintiffs listed Pacific Union as having a secured claim for the Mortgage in the amount of $160,290.00.

6

17.   On December 30, 2017, Plaintiffs filed their Chapter 13 Plan in accordance with 11 U.S.C. § 1322(b)(5), providing for the cure of any then-deficiency and the direct payment of all future Mortgage payments by Plaintiffs to Pacific Union.

18.   On January 12, 2018, Plaintiffs' Plan was confirmed and became *res judicata* as to Plaintiffs and Pacific Union.

19.   Pacific Union was served with a copy of the Confirmation Order on January 14, 2018, by the Bankruptcy Noticing Center.

20.   On January 31, 2018, Pacific Union filed a Proof of Claim in Plaintiffs' Bankruptcy Case, Claim 9, representing it was owed $159,552.62, inclusive of $117.09 in arrearages.

21.   The Bankruptcy Case is currently pending, and Plaintiffs continue to substantially perform under the terms of their Confirmed Plan.

22.   The Mortgage owed to Pacific Union has not been discharged and is not subject to discharge, under 11 U.S.C. § 1328(a)(1). See, *In re Duke*, 447 B.R. 365 (Bankr. M.D. Ga. 2011).

23.     As recently as March 9, 2018, Pacific Union advised the Bankruptcy Court and Plaintiffs that Plaintiffs' Mortgage was being serviced by Pacific Union and that Plaintiffs' obligation is ongoing.

24.     Accordingly, Plaintiffs have continued to make, and Pacific Union has continued to service and accept, Plaintiffs' Mortgage payments.

**<u>Factual Allegations Regarding Consumer Reports<br>Containing Incorrect Information</u>**

25.     The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living that is used or expected to be used or collected in whole or in part for the following: a factor in establishing the consumer's eligibility for credit or insurance to be used primarily for personal, family, or household purposes; employment purposes; a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to; the review or collection of an account of the consumer; the underwriting of insurance involving the consumer; determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality

required by law to consider an applicant's financial responsibility or status; used by a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation; used by a person who otherwise has a legitimate business need for the information; used in connection with a business transaction that is initiated by the consumer; to review an account to determine whether the consumer continues to meet the terms of the account; and/or used by executive departments and agencies in connection with the issuance of government-sponsored individually-billed travel charge cards. 15 U.S.C. §§ 1681a(d)(1) and 1681b(a)(3).

26.    The terms "consumer report", "credit report", and "consumer credit report" are used synonymously herein.

27.    The reporting of consumer credit information, by credit reporting agencies ("CRAs") and data furnishers, is the foundation of credit risk scoring and impacts the financial lives of consumers in innumerable ways, including the availability and cost of credit, housing opportunities, leasing prospects, insurance availability and cost, utility service, and even employment. Approximately two million consumer reports are issued by credit bureaus each day. See, Robert B.

Avery, Paul S. Calem, and Glenn B. Canner, Federal Reserve Board, Division of Research and Statistics, and Raphael W. Bostic, University of Southern California, *An Overview of Consumer Data and Credit Reporting* (February 2003), p. 48-49, available at *https://www.federalreserve.gov/pubs/bulletin/2003/0203lead.pdf* (accessed June 21, 2018).

28. In 2012, the Federal Trade Commission conducted a study regarding consumer credit reporting errors and determined that anywhere from 10 to 21 percent of consumers have confirmed errors on their consumer reports. Federal Trade Commission, *Report to Congress under Section 319 of the Fair and Accurate Credit Transactions Act of 2003* (December 2012), p. iv of Executive Summary, available at *https://www.ftc.gov/sites/default/files/documents/reports/section-319-fair-and-accurate-credit-transactions-act-2003-fifth-interim-federal-trade-commission/130211factareport.pdf* (accessed June 21, 2018).

29. The FTC study found that not only do these errors adversely affect consumers' credit scores, but the estimated proportion of reports and consumers who experience a positive credit score change resulting from the *correction* of these errors is higher than previous estimates from the credit reporting industry. *Id.*

10

30.    There is no established rule or threshold for classifying the significance of a credit score change as minor or major because the impact of a change in score is dependent on the current score. That is, a twenty-five-point change in a credit score that keeps the consumer in a particular credit risk category may not have a large impact on the person's likelihood of receiving credit. However, a one-point change in credit score that moves the consumer from one risk tier to the next may have a large impact on the consumer's access to credit or the products and rates the consumer is able to secure. *Id.* at i.

31.    Consistent with FTC study, the Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. See, *https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report/* (accessed June 21, 2018).

## Factual Allegations Regarding the Consumer Credit Reporting Industry, Reporting Standards, and Disputed Information

32.    The Consumer Data Industry Association ("CDIA") is an international trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services, and the CDIA is active in both federal and

11

state legislative affairs, public relations, education, and the promulgation of industry standards.

33.    Because consumer credit reporting information is such sensitive data that has far reaching implications for most, if not all, consumers, the CDIA works together with CRAs to develop, maintain and enhance industry-standard reporting formats and guidelines.

34.    In cooperation with Trans Union LLC, Equifax Information Services, LLC, Experian Information Solutions, Inc., and Innovis Data Solutions, Inc., the CDIA publishes the Metro 2 ("Metro 2") reporting standards to assist data furnishers with their compliance requirements under the FCRA. CDIA's reporting products are used in more than nine billion transactions each year.

See, *http://www.cdiaonline.org/about/index.cfm?unItemNumber=515.*

35.    The uniform adoption and implementation of the Metro 2 standards is the primary vehicle by which CRAs and data furnishers ensure that they are in compliance with their duties to ensure that they maintain complete and accurate information under the FCRA.

36.   The Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring.

37.   Equifax has actual knowledge that entities reviewing consumer reports prepared by Equifax reasonably presume that Equifax has complied with CDIA guidelines and Metro 2 standards in compiling and reporting the data in those consumer reports.

38.   Pacific Union has actual knowledge that entities reviewing consumer reports containing information reported and furnished by Pacific Union reasonably presume that Pacific Union has complied with CDIA guidelines and Metro 2 reporting that data to consumer reporting agencies.

39.   § 1681i(a)(5)(D) of the FCRA requires CRAs to implement an automated reinvestigation system through which furnishers of information to a CRA may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file to other CRAs.

40.   To comply with the automated dispute reinvestigation requirements of the FCRA, the three national CRAs (Trans Union LLC, Equifax Information Services, LLC, Experian Information Solutions, Inc.), along with Innovis Data

13

Solutions, Inc., developed and implemented a browser-based software system that allows the CRAs to electronically notify furnishers easily and quickly of disputed credit reporting information, and for furnishers to easily and quickly respond to such disputes following investigation. The system is commonly referred to as e-OSCAR (Online Solution for Complete and Accurate Reporting) and was designed to be Metro 2 compliant. See, *http://www.e-oscar.org/*.

41.   The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Dataform ("AUD") processing, as well as other various related data reporting processes.

42.   ACDVs are notifications initiated by a CRA and transmitted to a furnisher in response to a consumer dispute and are the primary method the CRAs use to fulfill their statutory obligation to notify furnishers of disputed information of consumers' disputes.

43.   Equifax has actual knowledge that entities reviewing consumer reports prepared by Equifax reasonably presume that Equifax has complied with its duties under § 1681e in compiling and reporting data with maximum possible accuracy in consumer reports.

44.    Equifax has actual knowledge that entities reviewing consumer reports prepared by Equifax reasonably presume that Equifax has complied with its duties under § 1681i in reinvestigating and correcting disputed information, and thus maintaining the maximum possible accuracy of data reported in consumer reports.

45.    Pacific Union has actual knowledge that entities reviewing consumer reports containing information reported and furnished by Pacific Union reasonably presume that Pacific Union has complied with its duties under § 1681s-2(b) in investigating and correcting disputed information.

## Factual Allegations Regarding Consumer Reports Containing Incorrect Information, and the Impact on Scoring

46.    The Fair Isaac Corporation credit risk scoring system, commonly referred to as "FICO", is the leading credit scoring system and utilizes data reported by credit reporting agencies. See, *https://www.myfico.com/credit-education/credit-scores/* (accessed June 21, 2018).

47.    The Fair Isaac Corporation uses the data in consumer reports to calculate consumers' credit scores (also known as credit risk scores). *Id*.

48.    The term "credit score" is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges

15

a loan to predict the likelihood of certain credit behaviors, including default. Consumer Financial Protection Bureau, *Supervision and Examination Manual, Version 2* (October 2012), p. 53, available at *http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf* (accessed June 21, 2018).

49.    FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and mix of accounts/types of credit accounts for 10% of a consumer's FICO score. See, *www.myfico.com/credit-education/whats-in-your-credit-score/*.

50.    Payment history is the most important aspect of a consumer's credit score because it shows how the consumer has managed his finances, including any late payments. Credit history is also very important, as it demonstrates how long the consumer has been managing his accounts, when his last payments were made, and

16

any recent charges. See, *https://www.transunion.com/credit-score* (accessed June 21, 2018).

51.    The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

52.    Inaccurate or incorrect credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

53.    Incorrectly reporting Plaintiffs' Mortgage—which is open, active, and has a balance that Plaintiffs are making payments on—as closed and with a balance of $0, adversely affects Plaintiffs' FICO scores, as it excludes any recent positive payment history associated with the Mortgage, it alters the age/length of credit history, and it alters the mix of accounts/types.

54.    Other entities that regularly review consumer reports, and use the data contained therein, are insurance companies.

17

55.   Insurance companies use a scoring mechanism which is similar to, but distinct from, the "credit score" used by creditors.

56.   Credit-based insurance scores, like credit scores themselves, are numerical summaries of consumers' credit histories; credit-based insurance scores are typically calculated using a multitude of information, including, but not limited to, the length and age of credit history and the use of certain types of credit. Federal Trade Commission, *Credit-Based Insurance Scores: Impacts on Consumers of Automobile Insurance* (July 2007), p. 11, available at

*https://www.ftc.gov/sites/default/files/documents/reports/credit-based-insurance-scores-impacts-consumers-automobile-insurance-report-congress-federal-trade/p044804facta_report_credit-based_insurance_scores.pdf* (accessed June 21, 2018). As cited in *Ins. Inst. V. Commissioner*, 486 Mich. 370, 785 N.W.2d 67 (2010).

57.   Credit-based insurance scores evolved from traditional credit scores, and all major automobile insurance companies use credit-based insurance scores in some capacity; insurers use these scores to assign consumers to risk pools and to determine the premiums that they pay. *Id.* at 22.

18

58.    Homeowner's insurance companies also use credit scores to decide whether to issue policies, and on what terms. A higher credit score is taken to mean that a consumer is less of a risk, which, in turn, means the consumer is more likely to be able to obtain insurance, and pay less for it.

See, *https://www.consumer.ftc.gov/articles/0152-credit-scores*.

59.    The National Association of Insurance Commissioners ("NAIC") is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia, and five U.S. territories. See, *http://www.naic.org/index_about.htm*.

60.    The NAIC advises consumers who find errors on their credit reports to contact the credit reporting company to have the errors corrected, as the errors can affect the consumer's credit-based insurance score. National Association of Insurance Commissioners, *Credit-Based Insurance Scores: How an Insurance Company Can Use Your Credit to Determine Your Premium*, available at http://www.naic.org/documents/consumer_alert_credit_based_insurance_scores.htm.

61.   Payment history, credit history length, and credit mix (the types of credit a consumer has, such as credit cards, a mortgage, auto loans, etc.) account for 60% of a consumer's credit-based insurance score. *Id*.

62.   Incorrectly reporting Plaintiffs' Mortgage—which is open, active, and has a balance that Plaintiffs are making payments on—as closed and with a balance of $0, adversely affects Plaintiffs' credit-based insurance scores, as it excludes any recent positive payment history associated with the Mortgage, it alters the age/length of credit history, and it alters the mix of accounts/types.

### Factual Allegations Regarding Reporting to and by Equifax Regarding Bobby Ray Smith

63.   On or about May 22, 2018, Mr. Smith obtained a copy of his consumer report as published by Equifax.

64.   That report contained erroneous information as provided by Pacific Union and as published and reported by Equifax.

65.   Specifically, the report showed the Mortgage as "Closed," with no balance, and included language indicating the Mortgage was discharged in bankruptcy.

66.     The relevant portion of the Pacific Union tradeline appeared in the May

22, 2018, Equifax report as follows:

## 3.1 PACIFIC UNION FINANCIAL, L (CLOSED)

### Summary

Your debt-to-credit ratio represents the amount of credit you're using and generally makes up a percentage of your credit score. It's calculated by dividing an account's reported balance by its credit limit.

| | | | |
|---|---|---|---|
| Account Number | xxxxxxxxx 8277 | Reported Balance | |
| Account Status | INCLUDED_IN_CHAPTER_13 | Debt-to-Credit Ratio | N/A |
| Available Credit | | | |

### Account Details

View detailed information about this account. Contact the creditor or lender if you have any questions about it.

| | | | |
|---|---|---|---|
| High Credit | | Owner | JOINT_CONTRACTUAL_LIABILITY |
| Credit Limit | | Account Type | MORTGAGE |
| Terms Frequency | MONTHLY | Term Duration | 0 |
| Balance | | Date Opened | Sep 11, 2015 |
| Amount Past Due | | Date Reported | May 01, 2018 |
| Actual Payment Amount | | Date of Last Payment | Apr 01, 2018 |
| Date of Last Activity | | Scheduled Payment Amount | |
| Months Reviewed | 28 | Delinquency First Reported | Oct 01, 2017 |
| Activity Designator | | Creditor Classification | UNKNOWN |
| Deferred Payment Start Date | | Charge Off Amount | |
| Balloon Payment Date | | Balloon Payment Amount | |
| Loan Type | Federal Housing Administration Real Estate Mortgage | Date Closed | |
| Date of First Delinquency | Oct 01, 2017 | | |

### Comments

Bankruptcy chapter 13
Bankruptcy petition
Loan modified

### Contact

PACIFIC UNION FINANCIAL, L
1603 Lyndon B Johnson Fwy
Farmers Branch, TX  75234-6040
1-469-804-1139

21

(Remaining portion of tradeline omitted.)

67.     Because the Mortgage is not closed, the balance of the Mortgage is not $0, the Mortgage was not discharged in bankruptcy, and because Plaintiffs continue to make payments to Pacific Union, the information described above was both false and misleading.

68.     Further, the specific reporting described above was in derogation of accepted industry standards for reporting the account as set forth by the CDIA and Metro 2 and as adopted by Defendants. See e.g., 2015 CDIA Credit Reporting Resource Guide ("2015 Metro 2").

69.     In a letter dated June 20, 2018, Mr. Smith disputed the inaccurate and misleading information directly to Equifax and advised Equifax that the Mortgage is included in his Bankruptcy Case but is not discharged and should not be reporting as "Closed". The relevant portion of Mr. Smith's dispute is reproduced below:

Also, my mortgage with Pacific Union Financial, 1603 Lyndon B. Johnson Freeway, Farmers Branch, Texas 75234-6040, account number XXXXXXXXX8277, is incorrectly reporting as "Closed". My mortgage is included in my active bankruptcy case, but is not discharged, and I continue to make payments as scheduled. I am including a copy of the proof of claim filed by Pacific Union for your reference. Please forward the enclosed documents to assist the furnisher with its review.

70.     In support of Mr. Smith's dispute, and to assist Defendants' respective investigations, Mr. Smith included with his dispute a copy of the Proof of Claim filed by Pacific Union.

71.     Pursuant to 15 U.S.C. § 1681i, Equifax had a duty to notify Pacific Union of Mr. Smith's dispute within five business days of receiving the dispute, to forward the attached documents for Pacific Union's review, to conduct a reasonable reinvestigation of the disputed information, and to correct the tradeline or delete it from Mr. Smith's consumer file.

72.     Upon information and belief, Equifax timely notified Pacific Union of Mr. Smith's dispute, via e-OSCAR or otherwise, and provided the supporting documents, as required by 15 U.S.C. § 1681i.

73.     Alternatively, Equifax failed to notify Pacific Union and to provide the supporting documents, as required by 15 U.S.C. § 1681i.

74.     Pursuant to 15 U.S.C. § 1681s-2, Pacific Union had a duty to conduct an investigation with respect to the disputed information and to modify or delete that information appropriately.

75.     In a document dated July 23, 2018, Equifax advised Mr. Smith that it had researched the dispute and provided a "revised report" that reflected its findings. Equifax provided a copy of the tradeline as reported "post-investigation", which now falsely reported the Mortgage as having a $0 balance, a last payment amount of $0, and a last payment date of October 2017.

76.     Specifically, the Pacific Union tradeline appeared in the revised July 23, 2018, Equifax report as follows:

| Pacific Union Financial, LLC | 1603 Lyndon B Johnson Fwy  Farmers Branch TX 75234-6040 / (469) 804-1139 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Account Number | Date Opened | High Credit | Credit Limit | Terms Duration | Terms Frequency | Months Revd | Activity Designator | | Creditor Classification | | |
| 836000116* | 09/11/2015 | $0 | $0 | | Monthly | 29 | | | | | |
| Items As of | Balance | Amount | Date of | Actual | Scheduled | Date of 1st | Date of | Date Maj. | Charge Off | Deferred Pay | Balloon Pay | Balloon | Date |
| Date Reported | Amount | Past Due | Last Payment | Payment Amount | Payment Amount | Delinquency | Last Activity | Del, 1st Rptd | Amount | Start Date | Amount | Pay Date | Closed |
| 07/23/2018 | $0 | $0 | 10/2017 | $0 | $0 | 10/2017 | | 10/2017 | $0 | | $0 | | |
| Status | | Type of Account | | Type of Loan | | Whose Account | | Portfolio Indicator | | Portfolio Status | | | |
| Included In Wage Earner Plan | | | | Fha Real Estate Mortgage | | Joint Account | | | | | | | |

ADDITIONAL INFORMATION:
Bankruptcy Chapter 13

77.     Defendants' post-investigation reporting is, independently and jointly, false and misleading.

78.     Defendants' post-investigation reporting is, independently and jointly, in derogation of the Metro 2 reporting standards, and that departure and failure to adhere to the adopted guidelines renders the reporting both false and materially misleading, as users of consumer reports assume Defendants' compliance with Metro 2 standards in reporting consumer information.

24

79.     There is no indication in the tradeline of the "verified" report that Mr. Smith has disputed the information reported and published by Equifax and Pacific Union. The failure to note the legitimate dispute by Mr. Smith of the relevant tradeline renders the reporting materially misleading.

### Factual Allegations Regarding Reporting to and by Equifax Regarding Cheryl Kinsey Smith

80.     On or about May 22, 2018, Mrs. Smith obtained a copy of her consumer report as published by Equifax.

81.     That report contained erroneous information as provided by Pacific Union and as published and reported by Equifax.

82.     Specifically, the report showed the Mortgage as "Closed," with no balance, and included language indicating the Mortgage was discharged in bankruptcy.

83.     The relevant portion of the Pacific Union tradeline appeared in the May 22, 2018, Equifax report as follows:

### 3.1 PACIFIC UNION FINANCIAL, L (CLOSED)

**Summary**

Your debt-to-credit ratio represents the amount of credit you're using and generally makes up a percentage of your credit score. It's calculated by dividing an account's reported balance by its credit limit.

| Account Number | xxxxxxxxx 8277 | Reported Balance | |
|---|---|---|---|
| Account Status | INCLUDED_IN_CHAPTER_13 | Debt-to-Credit Ratio | N/A |
| Available Credit | | | |

**Account Details**

View detailed information about this account. Contact the creditor or lender if you have any questions about it.

| High Credit | | Owner | JOINT_CONTRACTUAL_LIABILITY |
|---|---|---|---|
| Credit Limit | | Account Type | MORTGAGE |
| | | | |
| Terms Frequency | MONTHLY | Term Duration | 0 |
| Balance | | Date Opened | Sep 11, 2015 |
| Amount Past Due | | Date Reported | May 01, 2018 |
| Actual Payment Amount | | Date of Last Payment | Apr 01, 2018 |
| Date of Last Activity | | Scheduled Payment Amount | |
| Months Reviewed | 28 | Delinquency First Reported | Oct 01, 2017 |
| Activity Designator | | Creditor Classification | UNKNOWN |
| Deferred Payment Start Date | | Charge Off Amount | |
| Balloon Payment Date | | Balloon Payment Amount | |
| Loan Type | Federal Housing Administration Real Estate Mortgage | Date Closed | |
| Date of First Delinquency | Oct 01, 2017 | | |

| **Comments** | **Contact** |
|---|---|
| Bankruptcy chapter 13 | PACIFIC UNION FINANCIAL, L |
| Bankruptcy petition | 1603 Lyndon B Johnson Fwy |
| Loan modified | Farmers Branch, TX 75234-6040 |
| | 1-469-804-1139 |

(Remaining portion of tradeline omitted.)

84.    Because the Mortgage is not closed, the balance of the Mortgage is not

$0, the Mortgage was not discharged in bankruptcy, and because Plaintiffs continue

26

to make payments to Pacific Union, the information described above was both false and misleading.

85.    Further, the specific reporting described above was in derogation of accepted industry standards for reporting the account as set forth by the CDIA and Metro 2 and as adopted by Defendants. See e.g., 2015 CDIA Credit Reporting Resource Guide ("2015 Metro 2").

86.    In a letter dated June 20, 2018, Mrs. Smith disputed the inaccurate and misleading information directly to Equifax and advised Equifax that the Mortgage is included in her Bankruptcy Case but is not discharged and should not be reporting as "Closed". The relevant portion of Mrs. Smith's dispute is reproduced below:

> My mortgage with Pacific Union Financial, 1603 Lyndon B. Johnson Freeway, Farmers Branch, Texas 75234-6040, account number XXXXXXXXX8277, is incorrectly reporting as "Closed". My mortgage is included in my active bankruptcy case, but is not discharged, and I continue to make payments as scheduled. I am including a copy of the proof of claim filed by Pacific Union for your reference. Please forward the enclosed documents to assist the furnisher with its review.

87.    In support of Mrs. Smith's dispute, and to assist Defendants' respective investigations, Mrs. Smith included with her dispute a copy of the Proof of Claim filed by Pacific Union.

88.     Pursuant to 15 U.S.C. § 1681i, Equifax had a duty to notify Pacific Union of Mrs. Smith's dispute within five business days of receiving the dispute, to forward the attached documents for Pacific Union's review, to conduct a reasonable reinvestigation of the disputed information, and to correct the tradeline or delete it from Mrs. Smith's consumer file.

89.     Upon information and belief, Equifax timely notified Pacific Union of Mrs. Smith's dispute, via e-OSCAR or otherwise, and provided the supporting documents, as required by 15 U.S.C. § 1681i.

90.     Alternatively, Equifax failed to notify Pacific Union and to provide the supporting documents, as required by 15 U.S.C. § 1681i.

91.     Pursuant to 15 U.S.C. § 1681s-2, Pacific Union had a duty to conduct an investigation with respect to the disputed information and to modify or delete that information appropriately.

92.     In a document dated July 2, 2018, Equifax advised Mrs. Smith that it had researched the dispute and provided a "revised report" that reflected its findings. Equifax provided a copy of the tradeline as reported "post-investigation", which now

falsely reported the Mortgage as having a $0 balance and a last payment amount of $0.

93.     Specifically, the Pacific Union tradeline appeared in the revised July 2, 2018, Equifax report as follows:

| Pacific Union Financial, LLC | | 1603 Lyndon B Johnson Fwy  Farmers Branch TX 75234-6040 : (469) 804-1139 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Account Number | | Date Opened | High Credit | Credit Limit | Terms Duration | Terms Frequency | | Months Rev'd | Activity Designator | | Creditor Classification | |
| 836000116* | | 09/11/2015 | $0 | $0 | | Monthly | | 29 | | | | |
| Items As of  Date Reported | Balance  Amount | Amount  Past Due | Date of  Last Payment | Actual  Payment Amount | Scheduled  Payment Amount | Date of 1st  Delinquency | Date of  Last Activity | Date Maj.  Del. 1st Rptd | Charge Off  Amount | Deferred Pay  Start Date | Balloon Pay  Amount | Balloon  Pay Date | Date  Closed |
| 07/02/2018 | $0 | $0 | 05/2018 | $0 | $0 | 10/2017 | | 10/2017 | $0 | | $0 | |
| Status | | Type of Account | | Type of Loan | | Whose Account | | Portfolio Indicator | | Portfolio Status | | |
| Included in Wage Earner Plan | | | | Fha Real Estate Mortgage | | Joint Account | | | | | | |
| ADDITIONAL INFORMATION: | | | | | | | | | | | | |
| Bankruptcy Chapter 13 | | | | | | | | | | | | |

94.     Defendants' post-investigation reporting is, independently and jointly, false and misleading.

95.     Defendants' post-investigation reporting is, independently and jointly, in derogation of the Metro 2 reporting standards, and that departure and failure to adhere to the adopted guidelines renders the reporting both false and materially misleading, as users of consumer reports assume Defendants' compliance with Metro 2 standards in reporting consumer information.

96.     There is no indication in the tradeline of the "verified" report that Mrs. Smith has disputed the information reported and published by Equifax and Pacific Union. The failure to note the legitimate dispute by Mrs. Smith of the relevant tradeline renders the reporting materially misleading.

29

## Injuries-in-Fact

97.    Defendants' actions and omissions have resulted in the illegitimate suppression of Plaintiffs' FICO credit scores and other credit rating model scores.

98.    The adverse effect on Plaintiffs' credit scores places Plaintiffs at the material risk of being denied credit or receiving less favorable credit terms than they otherwise would.

99.    Further, the Courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *Pedro v. Equifax, Inc*., 868 F.3d 1275 (11th Cir. 2017) ("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that she suffered an injury in fact, she has standing to pursue her complaint."); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate"); *Santangelo v. Comcast Corp*., 162 F. Supp. 3d 691 (N.D. Ill. 2016) ("a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing"); *Binns v. Ocwen Loan Servicing, LLC*, No. 14-

01764, 2015 U.S. Dist. LEXIS 132743, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs' credit scores and reputations were considered intangible harms"); *Rothman v. U.S. Bank Nat'l Ass'n,* No. 13-03381, 2014 U.S. Dist. LEXIS 141100, 2014 WL 4966907, at *5 (N.D. Cal. Oct. 3, 2014) ("Injury to a credit score is sufficient to constitute 'actual damages'"); *Green v. RentGrow, Inc*., No. 2:16cv421, 2016 U.S. Dist. LEXIS 166229 ("A decrease in credit score may still establish an injury in fact sufficient to confer standing"); *Adams v. Fifth Third Bank*, No. 3:16-CV-00218-TBR, 2017 U.S. Dist. LEXIS 18932 (W.D. Ky. Feb. 9, 2017) ("Plaintiffs' allegations of lower credit scores … are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III."); and, *Coulbertson v. Experian Info. Sols., Inc*., No. 16-cv-05672-RS, 2017 U.S. Dist. LEXIS 69484 (N.D. Cal. Mar. 24, 2017) ("At a minimum, Coulbertson has alleged a sufficient injury-in-fact through her claim that her credit score suffered as a result of the credit report she disputes").

100.  Defendants' actions and omissions have resulted in the illegitimate suppression of Plaintiffs' credit-based insurance scores.

101.   The adverse effect on Plaintiffs' credit-based insurance scores places Plaintiffs at the material risk of being denied insurance or receiving less favorable insurance rates and terms than they otherwise would.

102.   Defendants' actions and omissions have also caused Plaintiffs' Equifax credit reports to falsely indicate to any viewer of those reports that Plaintiffs do not have a Mortgage, that the Mortgage was discharged in bankruptcy, and/or that Plaintiffs are not current on their Mortgage payments.

103.   This false impression creates a material risk that Plaintiffs would be denied credit, receive less favorable credit treatment than they otherwise would, or receive other unfavorable treatment than they otherwise would, from any viewer of Plaintiffs' credit reports engaged in judgment-based lending.

104.   Plaintiffs' pending bankruptcy does not preclude Plaintiffs from obtaining credit. On the contrary, it is not uncommon for consumers in an active Chapter 13 Bankruptcy case to access the credit markets for the replacement or acquisition of vehicles and the refinancing of mortgage debt.[1]

---

[1] The Federal Rules of Bankruptcy Procedure specifically provide for the method by which consumers in an active bankruptcy obtain approval for obtaining credit. Fed. R. Bankr. P. 4001(c).

105.   In point of fact, the FHA has a program for approving borrowers who are still making payments in a pending/active Chapter 13 Bankruptcy. U.S. Department of Housing and Urban Development, HUD 4155.1, Mortgage Credit Analysis for Mortgage Insurance (March 24, 2011) p. 4-C-13, available at *https://www.hud.gov/sites/documents/41551HSGH.PDF*.       See       also, *https://www.fha.com/fha_requirements_credit*.

106.   However, the existence of consumer reports which inaccurately report Plaintiffs' Mortgage as closed, with a $0 balance, and/or with incorrect payment history, makes it inherently more difficult and more expensive for Plaintiffs to refinance the Mortgage.

107.   For example, for Plaintiffs to obtain an FHA loan, the FHA's general credit policy requires lenders to obtain Plaintiffs' full credit report–not just Plaintiffs' credit score–and analyze Plaintiffs' credit history, liabilities, and debts to determine creditworthiness. U.S. Dep't of Hous. and Urban Dev., *Handbook 4000.1, FHA Single Family Housing Policy Handbook*, 250 (December 30, 2016), *https://www.hud.gov/sites/documents/40001HSGH.PDF*    (January    16,    2018) [https://perma.cc/UE3H-N3BS].

33

108.  To obtain an FHA refinance of the Mortgage, the lender must be able to verify Plaintiffs' payments for the Mortgage for the preceding 12 months. *Id*. at 409.

109.  In the event this information cannot be obtained via the consumer's credit report, FHA guidelines mandate that the consumer meet this burden through other, more difficult and time-consuming means. *Id*. at 410.

110.  Plaintiffs' correct payment history would be included in Plaintiffs' Equifax credit reports if Defendants had conducted appropriate investigations/reinvestigations of Plaintiffs' disputes.

111.  However, because the Mortgage is reported in Plaintiffs' Equifax credit report as closed and/or having a balance of $0, with incorrect last payment information, Plaintiffs will be forced to pursue alternative, more time-consuming, and more expensive means of demonstrating their payment history to a potential lender.

112.  Because Defendants failed to comply with their respective duties under the FCRA as detailed herein, Plaintiffs will need to obtain and provide verification of the Mortgage, bank statements, and/or other documents to demonstrate their payment history for the previous 12 months.

34

113.   This requires Plaintiffs to expend more time, effort, and money due to Defendants' failure to abide by their respective obligations under the FCRA to accurately report Plaintiffs' credit history.

### Damages

114.   Defendants, independently and jointly, breached their respective duties as described herein.

115.   Defendants had actual notice that the information they were reporting regarding Plaintiffs and the Mortgage was false, deceptive, and misleading.

116.   Defendants failed to correct their false, deceptive, and misleading reporting as described herein.

117.   Defendants had all the information necessary to correct their false, deceptive, and misleading reporting.

118.   Defendants had the ability to correct their false, deceptive, and misleading reporting.

119.   Despite the foregoing, Defendants continued to report the false, deceptive, and misleading information regarding Plaintiffs and the Mortgage.

120.   Accordingly, Defendants' conduct was willful.

35

121.   Upon information and belief, Defendants have published the false and misleading information regarding Plaintiffs to third parties.

122.   As a result of Defendants' willful actions and omissions, Plaintiffs are eligible for statutory damages.

123.   Additionally, as a result of Defendants' actions and omissions, Plaintiffs have suffered actual damages, including out-of-pocket expenses in challenging Defendants' wrongful representations regarding the Mortgage.

124.   Realizing that Defendants have, in effect, deprived Plaintiffs of an extended period of positive credit reporting on the most important account Plaintiffs have, and that Defendants continue to do so as a result of their respective failures to comply with the statutory requirements of 15 U.S.C. § 1681, *et seq*., Plaintiffs have experienced worry, frustration and stress.

125.   As a result of the actions and omissions of Defendants, Plaintiffs' actual damages also include the illegitimate suppression of their FICO credit score and other credit rating modeling scores.

126.   Defendants' failures to correct and clear the inaccuracies in Plaintiffs' Equifax report creates a material risk of financial harm to Plaintiffs stemming from the decreased perception of Plaintiffs' creditworthiness.

## CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. §§ 1681e(b) and 1681i – Equifax Information Services, LLC
### (Bobby Ray Smith)

127.   Plaintiffs incorporate by reference all preceding paragraphs as though fully stated herein.

128.   Pursuant to 15 U.S.C. § 1681e(b), Equifax is responsible for following reasonable procedures to assure maximum possible accuracy of information whenever it prepares consumer reports.

129.   Pursuant to 15 U.S.C. § 1681i(a)(1)(A), Equifax had an affirmative duty to independently investigate the dispute submitted by Mr. Smith.

130.   Pursuant to 15 U.S.C. § 1681i(a)(2), Equifax was required to communicate the specifics of Mr. Smith's dispute to Pacific Union, including the forwarding of any documents provided by Mr. Smith in support of that dispute.

131.   A consumer reporting agency's reasonable reinvestigation must be a good faith effort to ascertain the truth; a reasonable reinvestigation must answer the substance of the consumer's dispute and may not merely be a *pro forma* record review that simply begs the question.

132.   A reasonable reinvestigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

133.   The reasonableness of a reinvestigation under the FCRA is generally a question of fact for the jury.

134.   In order to conduct a reasonable reinvestigation, and pursuant to 15 U.S.C. § 1681i(a)(4), Equifax was required to review and consider all relevant information submitted by Mr. Smith.

135.   Mr. Smith's dispute was clear and unambiguous as to the inaccuracies of Equifax's reporting.

136.   Mr. Smith provided all the relevant information necessary for Equifax to reinvestigate and correct the inaccuracies in its reporting.

137.   Equifax breached its duties as described herein.

138.   If Equifax had conducted a reasonable reinvestigation of Mr. Smith's dispute, Equifax would have reviewed and considered all of the information Mr. Smith submitted in his dispute letter and would have easily detected that what was being reported was factually incorrect, inaccurate, and misleading.

139.   If Equifax had conducted a reasonable reinvestigation of Mr. Smith's dispute, the tradeline on Mr. Smith's Equifax consumer report would have been appropriately corrected.

140.   Due to Equifax's failures to follow reasonable procedures to assure maximum possible accuracy of information and failures to conduct a reasonable reinvestigation of Mr. Smith's dispute, the false and misleading information in Mr. Smith's credit file and on Mr. Smith's Equifax report was not appropriately modified.

141.   Equifax had all the information necessary to correct its reporting. Yet, Equifax failed to correct the information in the face of clear evidence that its reporting was false and misleading. The failure indicates that Equifax's review procedures were not reasonable.

142.   The fact that Equifax had all the information necessary to correct its reporting, yet failed to do so in an appropriate manner, further indicates that Equifax recklessly disregarded Mr. Smith's dispute and the requirements of the FCRA, amounting to a willful violation of the statute.

143.   Equifax willfully, or in the alternative negligently, violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of information concerning Mr. Smith in his consumer report, in reckless disregard of the statutory requirements, Mr. Smith's dispute, and the publicly recorded Bankruptcy Case filings.

144.   Equifax willfully, or in the alternative negligently, violated 15 U.S.C. § 1681i in multiple ways, including without limitation, by failing to conduct a reasonable reinvestigation of Mr. Smith's dispute, and by failing thereafter to appropriately modify information in his file and on his consumer report in reckless disregard of the statutory requirements, Mr. Smith's dispute, and the publicly recorded Bankruptcy Case filings.

145.   As a result of Equifax's violations of 15 U.S.C. §§ 1681e(b) and 1681i, Mr. Smith has suffered actual damages as described herein. Mr. Smith is, therefore,

entitled to recover actual damages from Equifax, pursuant to 15 U.S.C. §§ 1681n and 1681o.

146. Equifax's actions and omissions were willful, rendering Equifax liable to Mr. Smith for punitive damages and/or statutory damages, pursuant to 15 U.S.C. § 1681n.

147. Mr. Smith is entitled to recover costs and attorneys' fees from Equifax, pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT II

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. §§ 1681e(b) and 1681i – Equifax Information Services, LLC
### (Cheryl Kinsey Smith)

148. Plaintiffs incorporate by reference paragraphs 1 through 126 as though fully stated herein.

149. Pursuant to 15 U.S.C. § 1681e(b), Equifax is responsible for following reasonable procedures to assure maximum possible accuracy of information whenever it prepares consumer reports.

150. Pursuant to 15 U.S.C. § 1681i(a)(1)(A), Equifax had an affirmative duty to independently investigate the dispute submitted by Mrs. Smith.

151.   Pursuant to 15 U.S.C. § 1681i(a)(2), Equifax was required to communicate the specifics of Mrs. Smith's dispute to Pacific Union, including the forwarding of any documents provided by Mrs. Smith in support of that dispute.

152.   A consumer reporting agency's reasonable reinvestigation must be a good faith effort to ascertain the truth; a reasonable reinvestigation must answer the substance of the consumer's dispute and may not merely be a *pro forma* record review that simply begs the question.

153.   A reasonable reinvestigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

154.   The reasonableness of a reinvestigation under the FCRA is generally a question of fact for the jury.

155.   In order to conduct a reasonable reinvestigation, and pursuant to 15 U.S.C. § 1681i(a)(4), Equifax was required to review and consider all relevant information submitted by Mrs. Smith.

156.   Mrs. Smith's dispute was clear and unambiguous as to the inaccuracies of Equifax's reporting.

157.   Mrs. Smith provided all the relevant information necessary for Equifax to reinvestigate and correct the inaccuracies in its reporting.

158.   Equifax breached its duties as described herein.

159.   If Equifax had conducted a reasonable reinvestigation of Mrs. Smith's dispute, Equifax would have reviewed and considered all of the information Mrs. Smith submitted in her dispute letter and would have easily detected that what was being reported was factually incorrect, inaccurate, and misleading.

160.   If Equifax had conducted a reasonable reinvestigation of Mrs. Smith's dispute, the tradeline on Mrs. Smith's Equifax consumer report would have been appropriately corrected.

161.   Due to Equifax's failures to follow reasonable procedures to assure maximum possible accuracy of information and failures to conduct a reasonable reinvestigation of Mrs. Smith's dispute, the false and misleading information in Mrs. Smith's credit file and on Mrs. Smith's Equifax report was not appropriately modified.

162.   Equifax had all the information necessary to correct its reporting. Yet, Equifax failed to correct the information in the face of clear evidence that its

reporting was false and misleading. The failure indicates that Equifax's review procedures were not reasonable.

163.   The fact that Equifax had all the information necessary to correct its reporting, yet failed to do so in an appropriate manner, further indicates that Equifax recklessly disregarded Mrs. Smith's dispute and the requirements of the FCRA, amounting to a willful violation of the statute.

164.   Equifax willfully, or in the alternative negligently, violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of information concerning Mrs. Smith in her consumer report, in reckless disregard of the statutory requirements, Mrs. Smith's dispute, and the publicly recorded Bankruptcy Case filings.

165.   Equifax willfully, or in the alternative negligently, violated 15 U.S.C. § 1681i in multiple ways, including without limitation, by failing to conduct a reasonable reinvestigation of Mrs. Smith's dispute, and by failing thereafter to appropriately modify information in her file and on her consumer report in reckless disregard of the statutory requirements, Mrs. Smith's dispute, and the publicly recorded Bankruptcy Case filings.

44

166.   As a result of Equifax's violations of 15 U.S.C. §§ 1681e(b) and 1681i, Mrs. Smith has suffered actual damages as described herein. Mrs. Smith is, therefore, entitled to recover actual damages from Equifax, pursuant to 15 U.S.C. §§ 1681n and 1681o.

167.   Equifax's actions and omissions were willful, rendering Equifax liable to Mrs. Smith for punitive damages and/or statutory damages, pursuant to 15 U.S.C. § 1681n.

168.   Mrs. Smith is entitled to recover costs and attorneys' fees from Equifax, pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT III

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681s-2(b) – Pacific Union Financial, LLC
### (Bobby Ray Smith)

169.   Plaintiffs incorporate by reference paragraphs 1 through 126 as though fully stated herein.

170.   Pursuant to 15 U.S.C. § 1681s-2(a), Pacific Union is responsible for providing accurate information whenever it furnishes information to any consumer reporting agencies.

171.   Upon information and belief, Equifax timely notified Pacific Union of Mr. Smith's dispute and provided Pacific Union with all the relevant information that Mr. Smith had submitted.

172.   Pursuant to 15 U.S.C. § 1681s-2(b), Pacific Union had a duty to investigate Mr. Smith's dispute and accurately report its findings to Equifax.

173.   A furnisher's investigation must be a good faith effort to ascertain the truth; a reasonable investigation must answer the substance of the consumer's dispute and may not merely be a *pro forma* record review that simply begs the question.

174.   A reasonable investigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

175.   The reasonableness of an investigation under the FCRA is generally a question of fact for the jury.

176.   In order to conduct a reasonable investigation, and pursuant to 15 U.S.C. § 1681s-2(b), Pacific Union was required to review and consider all relevant information submitted by Mr. Smith to Equifax.

177.   Mr. Smith's dispute was clear and unambiguous as to the inaccuracies of Pacific Union's reporting of the Mortgage.

178.   Pacific Union breached its duties as described herein.

179.   If Pacific Union had conducted a reasonable investigation of Mr. Smith's dispute, Pacific Union would have reviewed and considered all of the information Mr. Smith submitted to Equifax in his dispute and would have easily detected that what was being reported was factually incorrect, inaccurate, and misleading.

180.   If Pacific Union had conducted a reasonable investigation of Mr. Smith's dispute, the tradeline on Mr. Smith's consumer reports would have been corrected accordingly.

181.   Due to Pacific Union's failures to provide accurate information and failures to conduct reasonable investigations of Mr. Smith's dispute, the false and misleading information in Mr. Smith's credit file and on Mr. Smith's reports as described herein was not appropriately modified.

182.   Pacific Union had all the information necessary to correct its reporting. Yet, Pacific Union failed to suitably correct its reporting in the face of clear evidence

that it was false and misleading. The failure indicates that Pacific Union's review procedures were not reasonable.

183.   The fact that Pacific Union had all the information necessary to correct its reporting, yet failed to appropriately do so, further indicates that Pacific Union recklessly disregarded Mr. Smith's dispute and the requirements of the FCRA, amounting to a willful violation of the statute.

184.   Pacific Union willfully, or in the alternative negligently, violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation upon receiving notice of Mr. Smith's dispute from Equifax; by failing to appropriately report the results of its investigation; and by failing to appropriately modify the disputed information, in reckless disregard of the statutory requirements; Mr. Smith's dispute, and the publicly recorded Bankruptcy Case filings.

185.   As a result of Pacific Union's violations of 15 U.S.C. § 1681s-2(b), Mr. Smith has suffered actual damages as stated herein. Mr. Smith is, therefore, entitled to recover actual damages from Pacific Union under 15 U.S.C. §§ 1681n and 1681o.

186.   Pacific Union's actions and omissions were willful, rendering Pacific Union liable to Mr. Smith for punitive damages and/or statutory damages, pursuant to 15 U.S.C. § 1681n.

187.   Mr. Smith is entitled to recover costs and attorneys' fees from Pacific Union, pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT IV

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681s-2(b) – Pacific Union Financial, LLC
### (Cheryl Kinsey Smith)

188.   Plaintiffs incorporate by reference paragraphs 1 through 126 as though fully stated herein.

189.   Pursuant to 15 U.S.C. § 1681s-2(a), Pacific Union is responsible for providing accurate information whenever it furnishes information to any consumer reporting agencies.

190.   Upon information and belief, Equifax timely notified Pacific Union of Mrs. Smith's dispute and provided Pacific Union with all the relevant information that Mrs. Smith had submitted.

49

191.   Pursuant to 15 U.S.C. § 1681s-2(b), Pacific Union had a duty to investigate Mrs. Smith's dispute and accurately report its findings to Equifax.

192.   A furnisher's investigation must be a good faith effort to ascertain the truth; a reasonable investigation must answer the substance of the consumer's dispute and may not merely be a *pro forma* record review that simply begs the question.

193.   A reasonable investigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

194.   The reasonableness of an investigation under the FCRA is generally a question of fact for the jury.

195.   In order to conduct a reasonable investigation, and pursuant to 15 U.S.C. § 1681s-2(b), Pacific Union was required to review and consider all relevant information submitted by Mrs. Smith to Equifax.

196.   Mrs. Smith's dispute was clear and unambiguous as to the inaccuracies of Pacific Union's reporting of the Mortgage.

197.   Pacific Union breached its duties as described herein.

198.   If Pacific Union had conducted a reasonable investigation of Mrs. Smith's dispute, Pacific Union would have reviewed and considered all of the information Mrs. Smith submitted to Equifax in her dispute and would have easily detected that what was being reported was factually incorrect, inaccurate, and misleading.

199.   If Pacific Union had conducted a reasonable investigation of Mrs. Smith's dispute, the tradeline on Mrs. Smith's consumer reports would have been corrected accordingly.

200.   Due to Pacific Union's failures to provide accurate information and failures to conduct reasonable investigations of Mrs. Smith's dispute, the false and misleading information in Mrs. Smith's credit file and on Mrs. Smith's reports as described herein was not appropriately modified.

201.   Pacific Union had all the information necessary to correct its reporting. Yet, Pacific Union failed to suitably correct its reporting in the face of clear evidence that it was false and misleading. The failure indicates that Pacific Union's review procedures were not reasonable.

202.   The fact that Pacific Union had all the information necessary to correct its reporting, yet failed to appropriately do so, further indicates that Pacific Union recklessly disregarded Mrs. Smith's dispute and the requirements of the FCRA, amounting to a willful violation of the statute.

203.   Pacific Union willfully, or in the alternative negligently, violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation upon receiving notice of Mrs. Smith's dispute from Equifax; by failing to appropriately report the results of its investigation; and by failing to appropriately modify the disputed information, in reckless disregard of the statutory requirements; Mrs. Smith's dispute, and the publicly recorded Bankruptcy Case filings.

204.   As a result of Pacific Union's violations of 15 U.S.C. § 1681s-2(b), Mrs. Smith has suffered actual damages as stated herein. Mrs. Smith is, therefore, entitled to recover actual damages from Pacific Union under 15 U.S.C. §§ 1681n and 1681o.

205.   Pacific Union's actions and omissions were willful, rendering Pacific Union liable to Mrs. Smith for punitive damages and/or statutory damages, pursuant to 15 U.S.C. § 1681n.

206.   Mrs. Smith is entitled to recover costs and attorneys' fees from Pacific Union, pursuant to 15 U.S.C. §§ 1681n and 1681o.

## **TRIAL BY JURY**

207.   Plaintiffs are entitled to and hereby request a trial by jury.

**WHEREFORE**, Plaintiffs pray that judgment be entered in their favor and against Defendants, jointly and severally, for:

a.)  Plaintiffs' actual damages;

b.)  Punitive and/or statutory damages, pursuant to 15 U.S.C. § 1681n;

c.)  Reasonable attorney's fees and costs, pursuant to 15 U.S.C. §§ 1681n and/or 1681o; and

d.)  Such other and further relief as may be just and proper.

[Signature on following page.]

53

Respectfully submitted this 29th day of August, 2018.

**BERRY & ASSOCIATES**

*/s/ Paul J. Sieg*
Paul J. Sieg
Georgia Bar No.: 334182
*psieg@mattberry.com*
Matthew T. Berry
Georgia Bar No.: 055663
*matt@mattberry.com*
2751 Buford Highway, Suite 600
Atlanta, GA 30324
Ph. (404) 235-3334
Fax (404) 235-3333

*Plaintiffs' Attorneys*